# NANCY KASER-BOYD, PH.D.

CLINICAL AND FORENSIC PSYCHOLOGY

12725 VENTURA BLVD. SUITE K
STUDIO CITY, CALIFORNIA 91604
TELEPHONE (818) 506-0719
FAX (818) 506-0638

April 4, 2006

D. Scott Dattan
Attorney at Law
2600 Denali Street, Suite # 460
Anchorage, Alaska 99503

Sent by Facsimile: (907) 278-8571

RE: *United States vs. Shannon Rainey*, Case No: A05108CR(JWS)

Dear Mr. Dattan:

At your request, I have conducted a forensic psychological evaluation on Shannon Rainey. You forwarded background documents including an Affidavit in Application for a Search Warrant, which outlines evidence against Ms. Rainey and her husband Carlos Rainey. You also sent the Criminal Indictment which describes a conspiracy to obtain and distribute controlled substances, and you forwarded the DEA Reports of Ms. Rainey's role in the alleged conspiracy. Briefly, she is accused of taking packages containing large amounts of cocaine and shipping them from the Tacoma area to Anchorage, Alaska and the Indictment alleges that she had knowledge of the contents of these packages.

You asked that the forensic psychological evaluation address the nature of the relationship between Shannon and Carlos Rainey, particularly with respect to domestic violence and any effect this had on her participation in a criminal offense.

Shannon Rainey was psychologically evaluated on February 19, and 20, 2006 in Tacoma, Washington. In conducting the evaluation, I considered the materials you provided regarding criminal conduct, I conducted a clinical interview of five hours that included a Mental Status Examination, and I completed a battery of psychological tests that included the Minnesota Multiphasic Personality Inventory (MMPI-2), the Millon Clinical Multiaxial Inventory (MCMI-III) and the Rorschach Inkblot Method. Ms. Rainey was very cooperative with the evaluation process.

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 1 of 10

EX. B

## Family History

Ms. Rainey was born to an intact marital relationship of parents who were in a significant degree of conflict. When she was small her father had a serious alcohol problem, and he was physically and psychologically abusive to her mother. One of her most salient memories of childhood is of her mother curled up on Ms. Rainey's bed with her father hitting her – her mother would run into her room when her father came home drunk and violent. Ms. Rainey also has memories of being awakened in the middle of the night by her mother, who would take them to a friend's house. Ms. Rainey indicates that her father also once gave her sister (three years younger) a black eye. Her father had been in the Air Force in the Tacoma area and then worked for Alaska Airlines, in management. Ms. Rainey has a forgiving view of her father, indicating that he had "a nice side, too – we used to play and wrestle. We'd go on family vacations. It was just 'don't make him mad'". She takes a psychological view, which is part of her forgiving attitude toward him, indicating that his father "is like him, but ten times worse".

When Ms. Rainey was twelve years old, her parents divorced. Although this should have lessened the degree of conflict, she states that her mother sort of went off the deep end and became very involved in dating, and then in drugs and alcohol. Ms. Rainey indicates that her mother put her out at the age of fifteen so she could live with a boyfriend. She had apparently moved to a boyfriend's small apartment where there was no room for Ms. Rainey and she sent her to live with a girlfriend's mother. This was obviously very difficult for Ms. Rainey, who became very tearful during this part of the interview. Her mother continued on a downhill course, and is now homeless, living in the Sacramento area. She ultimately got addicted to Methamphetamines. Shannon states "She is supposed to be Bipolar but it's hard to tell because of all the drugs and alcohol. She is in and out of the hospital trying to kill herself. Now, she wants to come and live with me".

Like other girls with seriously neglectful parents, Ms. Rainey was searching for love from peers, particularly boys. By the age of fourteen, she was seriously dating a young African-American man from a neighboring high school. She dated him all through eighth, ninth and tenth grade. This man, Darryl, was from a somewhat higher socioeconomic family. His father was a realtor in the Tacoma area and his mother was a nurse. He was a football player at his school, and popular. For whatever reason, he treated Ms. Rainey very poorly. She recalled:

> "He was really mean to me. He would call me a bitch and cheat on me. In the end he gave me an STD. I got PID and it put me in the hospital. I was like fourteen and he was seventeen. He would make me say 'I'm your bitch' and sometimes during sex he would call me another girl's name".

I asked Ms. Rainey why she put up with that, although to a psychologist it is obvious. She said "I felt like I couldn't live if he left me". This relationship ended after a final infidelity she discovered when she visited him in his college environment at Eastern Washington State. The other girl confronted her, and screamed at her. She said "I felt devastated". Ms. Rainey never told anyone about the abuse from Darryl. She said "I was

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 2 of 10

too embarrassed. People would tell me I could do better, that I didn't need to be with him but I didn't feel that way about myself".

It would be important to note, here, that her father, who had maintained very irregular visitation during these years, disowned her when he found out she was dating a Black man, and he was even more disdainful when he learned that she was pregnant by Carlos Rainey. Although Ms. Rainey has a full sister who lived with their father all of her life, she is completely estranged from her sister, because of her father's attitude. I note, here, that isolation from one's family is a common predisposing factor for domestic violence, because a woman doesn't have family support.

### Relationship with Carlos Rainey

Ms. Rainey states that she met Carlos Rainey right after she came back from the devastating situation with Darryl at his college. Carlos seemed very sweet and very shy. He would tell her friends that he wanted to be her boyfriend, but was too shy to tell her and didn't want to be turned down. She met him in October of her junior year and by Christmas she was pregnant. As she recalls this time period, she feels she was sort of "in a fog" because "My mom had just chosen her boyfriend over me, and I was living with my girlfriend's mother, who was very strict. I was depressed. I was sleeping a lot and having a hard time getting up to go to school". Also, when she became her pregnant, her girlfriend's mother put her out. She said that she couldn't have her living in the home because she would be a bad influence on the family's younger children.

Ms. Rainey then went to live with Carlos' mother and she "basically ended up being my mom". This was a family life like she had longed for. She recalled:

> "I would sit up and talk to her. We would go through pictures and cook dinner. She told me about the family history. They were from Alaska. His real dad worked for the fire department there and his mom was a State Trooper in Alaska. His step dad was a Deputy at the King County Jail. They are really into martial arts".

In short, Ms. Rainey found Carlos' family to be relatively healthy in comparison to hers. She developed a strong bond to his mother, which continues to this day. Carlos' mother helped her significantly with her baby. Ms. Rainey recalls "I was young and I didn't always know what to do". Carlos' mother remained a safe haven and she and Carlos moved back into his mother's house numerous times as Carlos' erratic behavior took shape and colored their young adult lives.

Ms. Rainey indicates that when her baby was three or four months old, she got her own apartment in Tacoma, supported by Aid to Dependent Children. Carlos was still in high school, and remained in Federal Way with his mother. This geographical separation apparently allowed Carlos to pursue a second relationship with another girl (who was African-American). This was unknown to Ms. Rainey for quite some time but then the second girl became pregnant. Also Mr. Rainey was arrested for domestic violence against

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 3 of 10

the other girl. It is of psychological significance that the "other woman" pursued charges of domestic violence, but Ms. Rainey did not – reflecting her passivity and her desperate need to be a part of Mr. Rainey's family.

Mr. Rainey went to Washington State Prison for this offense. Although I did not have access to his criminal file, it suggests that either he had previous convictions, or this was a fairly serious incident of domestic violence. Though he had been unfaithful, Ms. Rainey visited him regularly in prison, taking their older son [she had given birth to their second child shortly before Carlos went to prison]. Ms. Rainey had some ambivalence about Carlos, however, and states she "ended up sleeping with this guy one time". When Carlos was released from prison she told him the truth about this and he battered her badly. She said:

> "He cracked my rib and it punctured my lung and I was in the hospital for a week. He pushed me and I was leaning backwards over the couch and he stomped on me with his foot. Then there was more yelling and he turned on the burner on the stove and he was going to burn my face. He dragged me to the stove. He took all the pictures of him and me and my son and ripped them up, and told me he was going to leave me. I was crying and telling him I didn't want him to leave me".

This may be hard for the average person to comprehend, but her desperate fears of abandonment were related to being abandoned by both of her parents, which is somewhat unusual, and her desperation about the thought of losing Carlos' mother, and her adopted family. These images are still powerfully distressing to Ms. Rainey. She sobbed through this whole part of the interview.

Ms. Rainey has rarely discussed this domestic violence with anyone. Mr. Rainey's mother was somewhat aware that Carlos could be abusive and would "tell him to knock it off" but Ms. Rainey indicates that she told everyone that her broken rib was from being "jumped" by a stranger while in Seattle. As you may know, protecting a battering husband is classic for Battered Woman Syndrome. Ms. Rainey was also in psychological denial, as even after this high level of violence, plus infidelity and evidence of an antisocial lifestyle, she married Mr. Rainey. This was after he was released from State Prison.

When her son was a year old, Ms. Rainey began working in Denny's and worked the night shift, from 11PM to 7AM. Mr. Rainey's mother took care of her son five days a week. This continued on through the birth of her second son. When Mr. Rainey was released from prison, aside from the bad battering she describes, she states "He was doing good, not drinking, and really trying". Still, she had her own apartment and was working and Mr. Rainey lived with his mother. Then they moved to Seattle where Mr. Rainey got a job delivering furniture and "It was O.K. for a long time". Gradually, Mr. Rainey began drinking and this seemed to be accompanied by significant violence. Ms. Rainey states:

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 4 of 10

> "He drank a lot and when he got really drunk there would be times when he would not know who I was. He came home once, at his parents' house, and I opened the door and he was looking at me like he didn't know who I was. He said I better get away from him because he felt like he was going crazy. He was talking about demons. I thought he was on drugs or something. He said 'Shannon you need to leave, otherwise I don't know what I'm going to do to you'. I said 'I'm not leaving you!' and he grabbed me by the throat and was choking me. And I got away from him and he flipped the table over and his brother and dad came out and he was like fighting with them and they ended up calling the police and taking him to the hospital. They ran some tests to see if there were drugs or anything. His alcohol level was .33. We didn't press charges or anything. When he sobered up, he told me he was so sorry and said that maybe he needed to go to the doctor. I agreed, but that never happened".

When Shannon was pregnant with her third child, a daughter, the couple moved to Portland and tried to start over. Ms. Rainey indicates that her mother lived in Portland and this was a brief pleasant respite for Ms. Rainey. Mr. Rainey was...

> "... doing good, working a lot, almost twenty-four hours a day to save up for our own place, and that was really the best time of my life because he was working and not drinking. I think because he didn't have any friends there, he was home a lot and it was like a family".

This is clearly Ms. Rainey's issue—having a family--as she broke into large racking sobs as she discussed this. This interlude of sobriety and good family life was brief, lasting only about nine months. After her daughter was born, Mr. Rainey's mother convinced them to move back to the Seattle area because "she didn't want us that far away".

Ms. Rainey indicates that Mr. Rainey had a number of other public incidents with drinking and violence. She indicates that on one occasion he went to a 7-11 store and his pants and shirt were off and he was "pretending he was in the military". The police "ended up tazing him and took him to Harborview and they kept him for one day". He was apparently let go, again apparently his behavior was attributed to alcohol intoxication.

Ms. Rainey indicates that her husband could be kind, generous, and thoughtful. She said, "We had some loving times. We would go to the movies, and to dinner. He told me he loved me all the time, and he started being a way better dad, being involved with the boys at school, helping our son with problems with reading, playing videogames with them."

At the same time, Mr. Rainey maintained the lifestyle of a single man. He was frequently out with his friends, drinking and carousing. He frequented a number of local bars, some of which have the reputation of being very rough. He rarely, if ever, took Ms. Rainey with him. She indicates that she was virtually always home with their three children. This explains some of the circumstances of Mr. Rainey's arrest for firing a gun in public. In August, 2005, he went to a bar with his friends. It was his birthday. As the bar was

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 5 of 10

closing, he shot a gun in the air in the parking lot. The police came, found a Glock pistol and sixteen spent .40 caliber casings. Carlos was arrested and criminally charged. This was apparently a violation of his parole and he was threatened with a return to prison. Ms. Rainey recalls a terrifying incident after his arrest:

> "He came home very drunk and told me to leave. I said 'No, I'm not going to leave you' and he put a knife to my eye. The blade was actually touching my eye. Then he covered my eyes and put it to my throat and said he would cut my throat. I was very scared and so I said 'O.K., I will go', and I took the kids and went to his mother's".

Also, in that time frame, in September, he got into a fight at a bar: "He thought a waitress had called him a 'Nigger', and as usual he was very drunk." His friends called Ms. Rainey and told her to come and get him but she was afraid to and called his mother. Ms. Rainey, knowing what Mr. Rainey was like when drinking and rageful, left her home. When he arrived "He proceeded to destroy the house. He broke everything in the living room and dining room, turned the couches over, broke all kinds of stuff". Her friend Michelle went looking for her and told her "Your house is destroyed".

Despite these extremely frightening incidents, Ms. Rainey indicates that she became upset to the point of panic when Mr. Rainey would threaten to leave her. She said that he was very angry at her for nagging him about his drinking and "said I called him too much when he was out. He said I should just sit at home and wait for him to come home and that I brought it all on myself". He would threaten to leave her and she would "beg him not to leave me because I felt I could not live without him". Because she was willing to live like this, she states that he went to the bars "almost every day" and stayed out from about 11 A.M. to 9 P.M. or so. By then, he "would be so drunk" that he would fall asleep, then wake up at midnight, hungry, and make her get up and cook for him.

When Ms. Rainey describes her marital life, the impression of a very traditional, dependent young woman is conveyed. In addition to the above, she said "I just wanted a family. I liked to make him happy. He would brag to his friends about my cooking, and I was proud of that." Also, like other battered women, she had significant anxiety about where she would go if she left Carlos. That would likely mean losing the support of his mother, who watched her children while she worked. Theirs was a relationship with financial struggle, and she was often worried about how she would provide health insurance and other basic necessities for her three children.

Like other very dependent women, Ms. Rainey also seems to be very naïve. I would note that there is a whole personality style diagnosed Dependent Personality Disorder, that describes her. As an example of her naïveté, when I asked her about Mr. Rainey's nickname "C-Murder" she said that it was not because he had murdered someone, that he had gotten that name in high school "because of football". Although I don't know his criminal record, this seems naïve. She said he had a fascination with guns, which is usually a sign of a dangerous man. In fact, as in other battering situations, he had used a gun to frighten and intimidate her. She related one incident where he accused her of

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 6 of 10

cheating on him and he pointed a gun at her head. Regarding her significant dependent personality style, I noted that Ms. Rainey was still wearing her wedding rings. I asked her if she planned to divorce him, and she began to cry and said "I love him more than anything, and I still do. I know he loves me, too. I just wish he would not drink". She has not comprehended that Mr. Rainey had, for quite some time, an antisocial lifestyle and likely has little ability to live in a different way.

### The Dynamics of Her Involvement in the Alleged Conspiracy

Ms. Rainey indicates that she was not aware that her husband was "doing illegal things until two summers ago". She had been receiving Moneygrams from Western Union but did not realize that the money came from drug sales. She thought that her husband was helping his uncle with his moving business in Alaska. At that point she only became aware because she overheard he and a friend talking – "they were talking about sending packages". She said that she begged him not to do this because he was "taking a risk of being taken away from us". She said she told him she would get two jobs to make sure there was enough money, that she didn't want him to have to do something illegal. She said he said he was "just going to do it real quick, to save money for a business". After this, when she tried to reason with him "he would say he couldn't stop, that he owed these people money, and who knew what they would do to me and the kids". The whole thing was deeply disturbing to her and frightening as well, as now she felt he had involved their children in an unsafe lifestyle.

I asked Ms. Rainey how she became involved in moving illegal drugs via interstate transports. She said that in the summer of 2005, her husband directed her to use her credit card to purchase one-way airline tickets for one of his friends, and he asked her to take a package to U.P.S. She said:

> "He had me buying all these one-way tickets and I tried to resist that. He was making me put them on my credit card. They were tickets for another guy. I told him I didn't want all of these one way tickets on my credit card and I told him I would put the ticket on hold for the guy but he could pay for it himself. Then the guy missed the flight and he said it was all my fault because the deal didn't go through, and he said he lost $100,000. When I told him I didn't want to do it, he said he was going to leave me. He said a lot of other girls would help him".

This, of course, was one of her biggest fears. Regarding the packages, Ms. Rainey indicates that she didn't really want to send the packages but she also didn't feel she could say no because of his threats to involve another woman. He also treated her coldly and was intimidating when she said no to him. In addition to the threat to leave her, he would say "Why the fuck can't you just do what I said? It's my house. I'm the head of the houschold. You do what I say. You're my wife!" She states, "So I would do it". Also, she states that she felt that if she took packages to FedEx or UPS, he would not have an excuse for leaving the house and stopping at the bar and wouldn't come home drunk. When he was drunk, he would bring up things he was already mad about, and these were clearly times when she feared his violence.

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 7 of 10

Ms. Rainey indicates that "at first I didn't even know what was in the packages but after the first packages came up missing and he freaked out I figured it out". Regarding calling and demanding action regarding the lost package, she indicates that Carlos was home the whole time, directing her to make frequent calls "to see what was happening". She indicates that he demanded that she file a claim regarding the lost packages. She said:

> "He was blaming me, said there was something I did, that I wrote the wrong address or something and made it my responsibility to find the packages. I was worried that he was going to start breaking stuff in the house again or be in my face yelling at me or threatening me".

In reality, in my opinion, there is little likelihood that Ms. Rainey would have been involved in drug dealing on her own. I refer the reader to her psychological test results below. Her personality is not consistent with antisocial behavioral practices nor with the kind of threatening intimidation that one sees in a criminally-oriented woman. With all of the violence that had been occurring in the relationship, it is clear that Ms. Rainey was threatened and intimidated by Mr. Rainey's anger. Her considerable emotional dependency on him also had a powerful motivating force in that he would threaten to leave her if she didn't do what he asked. In battering relationships, the interpersonal dynamic is one of coercive control. A batterer need not beat up a woman every time she defies him. Over time, a battered woman comes to understand that non-compliance raises a number of different threats. A clever, manipulative sociopath discovers another person's weakest point(s) and uses this for coercive control.

### Mental Status Examination

Shannon Rainey appears as a petite, pretty woman of about average intelligence. She seems quite naïve and dependent, with a life history that raises abandonment issues in the typical person. Her coping skills appear to be rather limited, perhaps in part because she doesn't have the social support systems available to some young mothers. She is also relatively concrete in her reasoning, and struggles to make sense of Carlos Rainey's two sides. Very evident was the low self-esteem and denial evident in women in abusive relationships.

### Psychological Test Results

Ms. Rainey was given the MMPI-2. This 567-item true-false questionnaire is in wide use in American clinical and forensic psychology. It has the ability to survey a broad array of psychological/psychiatric symptoms, as well as to assess whether the defendant is malingering a mental disorder. The scored test can be compared to so-called normal individuals in the national sample, as well as numerous research studies on adults with known diagnoses. In a criminal forensic context, the MMPI-2 can yield important information about antisocial personality disorder and capacity for violence.

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 8 of 10

Ms. Rainey's MMPI-2 profile was valid, with no indication that she was attempting to malinger a mental disorder. On the clinical scales, her scores hover around the "normal" score, although the "neurotic scales" are slightly up [T scores in the 60's] in comparison to the scales measuring more severe disturbances. Elevation of the so-called neurotic scales is consistent with the clinical interview and life history which led, in my opinion to a number of anxieties and conflicts, mostly centering about self-esteem, security, and issues of abandonment. I note, in particular, that she is not elevated on Scale 4, which typically does elevate in criminally-oriented men and women who are comfortable breaking social rules, are aggressive and impulsive, and have a history of conflict with authority figures [e.g., police]. Without the Scale 4 elevation, it is difficult to say that Ms. Rainey has the personality dynamics to head a criminal operation.

The Millon Clinical Multiaxial Inventory is also in wide use in clinical and forensic psychology. It is more oriented to measuring the psychological dimensions called personality traits, especially aspects of personality or behavior that have become dysfunctional. It, too, has validity scales, which permit an opinion about malingering or exaggeration.

On the MCMI-III, Ms. Rainey delivered a valid profile. She scored in the clinically-significant range on two scales that measure the need for social approval, and dependency. Battered women are often similarly elevated, and the dynamics, here are the need for approval and acceptance, and the fear of abandonment. These women are naïve, gullible and suggestible, often not looking below the surface of others' [or their own] behavior. As a result, they have not developed insight that could improve their judgment. They tend to make decisions based on emotion rather than logic, thus staying in an abusive relationship because they "love" their husband, rather than on a firm belief that they have a good marriage. On this test, Ms. Rainey is completely un-elevated on the Antisocial Personality Pattern scale and also on a scale that measures angry, aggressive behavior.

The Rorschach is employed in a forensic evaluation because it is difficult to manipulate the outcome. The average defendant does not know what the psychologist is looking for, does not know what kind of personality problems might be associated with certain kinds of responses. This makes it difficult to malinger mental illness. Ms. Rainey's Rorschach record is quite consistent with her educational level and with the description of her as a woman with relatively limited problem-solving skills. Inclined toward the "popular" percepts, she likely tends to be rather conventional and conforming. Many of her responses involved pairs [eg., two baby bears, two women, two little girls, a couple of witches], emphasizing her dependency. As with the other two tests, scores associated with violence or with antisocial tendencies are completely absent.

**OPINIONS**

Personality testing makes it highly unlikely that Shannon Rainey was a leader in the so-called Rainey Organization, as she lacks the capacity for aggression and dominance that would be necessary to organize and direct a group of antisocial men. In personality style,

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 9 of 10

she is very socially conforming and conventional. She is docile, gullible, and naïve, with a strong need for approval, acceptance, and nurturance. Her history, of course, includes multiple incidents of domestic violence from a man who has a criminal conviction for domestic violence. At the time of the instant offense, she had Battered Woman Syndrome, with the constellation of symptoms commonly seen. Mr. Rainey's anger posed a significant threat to her, and she feared defying him. He also manipulated her with threats to leave her, which was her unique weak point, because of her family history of abandonment by both parents. With her personality style, I think it is highly unlikely that she would have sold illegal drugs on her own, and her involvement in the instant offense is clearly the result of her relationship with Carlos Rainey.

If I can answer additional questions, please don't hesitate to contact me.

Respectfully Submitted,

Nancy Kaser-Boyd, Ph.D., A.B.A.P.
Clinical & Forensic Psychologist
Associate Clinical Professor
Geffen School of Medicine at UCLA
Semel Institute for the Neurosciences and Human Behavior

RE: Shannon Rainey
Case No: A05108CR(JWS)
Page 10 of 10